IN THE MATTER OF:

J.A and M.A. o/b/o G.A.,                                    Case No.: 2-23-cv-13106-FKB-CI

Plaintiffs,                                                          Hon.: F. Kay Behm

v.

Royal Oak School District,

Defendant.
_____

Ashley B. Jacobson (P83481)
Jacobson Law & Advocacy, PLLC
455 E. Eisenhower Pkwy Ste. 300
Ann Arbor, MI 48108
(248) 878-6940
Ashley@JLAPLLC.com

*Attorney for Plaintiffs*

Michele R. Eaddy (P41871)
Erin H. Walz (P55484)
THRUN LAW FIRM, P.C.
ATTORNEYS FOR RESPONDENT
2900 West Road Ste. 400
P.O. Box 2575
East Lansing, Michigan 48826-2575
(517) 484-8000
Meaddy@thrunlaw.com
Ewalz@thrunlaw.com

_____

## **BRIEF**

   Plaintiffs, J.A and M.A. ("Petitioners" or "the Parents") on behalf of their son,

G.A, by and through their attorney Ashley Jacobson of Jacobson Law & Advocacy,

PLLC, with their Brief…. and hereby states the following:

## <u>STATEMENT OF FACTS AND PROCEDERAL HISTORY</u>

Plaintiffs in this case are the parents of thirteen-year-old G.A. G.A had a tough start into this world. He was born with methadone in his system prior to his adoption by J.A and M.A. Due to his addiction to illegal substances, he was diagnosed with neonatal abstinence syndrome at the start of his life. He would later become diagnosed with a range of disabilities and medical conditions. The range of disabilities and medical conditions include but are not limited to Fetal Alcohol Spectrum Disorder (FASD), Anxiety, Attention Deficit Hyperactivity Disorder (ADHD), Reactive Attachment Disorder, Disruptive Mood Dysregulation Disorder, Sensory Dysregulation Disorder, and Executive Functioning Impairment. G.A.'s disabilities manifests in many ways, including but not limited to lowered cognitive ability and difficulty with reading comprehension, as well as emotional dysregulation. He does not have the ability to exercise mental restraint when confronted with certain situations or triggers. G.A.'s disruptive or intentional behavior is not willful, but reflects the lack of capacity to act how one without his level of disabilities would act. For someone on the outside of G.A. environment his behaviors could appear as unrulily or purposeful. Additionally, G.A. also has a history of craniosynostosis, which is a premature fusion of the sutures in the skull, for which he required surgical correction. (Trial Tr. Vol. 1, 18). G.A. and his parents J.A and M.A reside in the state of Michigan in Royal Oak county. G.A. is currently

in the 8th grade. During his third grade year, the Defendant determined that G.A was eligible for special education services under the eligibility category of Other Health Impairment (OHI). G.A. has very supportive parents who have fostered his participation in a wide array of services and activities. However, he does require accommodations, modifications, and services to ensure equal access in education and the opportunity to fully participate in academic and extracurricular or nonacademic activities without discrimination. In the United States, FASD is nearly twice as common as Autism Spectrum Disorder, with a range of between one (1) out of every twenty (20), to one (1) out of every forty-four (44) children having this diagnosis (Trial Tr. Vol. 3, 322-323). Although G.A.'s parents have appreciated past efforts made by the Defendant to provide *some* services for G.A., they have repeatedly raised several concern, including their assertion that the Defendant's staff were inadequately trained for G.A.'s disabilities nor did they offer the appropriate services or alternative programming to meet his educational and disability needs. Due to the Defendant's failure to provide appropriate services over the last two (2) school years, G.A. faced exacerbation of his disability symptoms and he is at the time of filing this brief, receiving his education in the most restrictive environment through homebound services. G.A. has been unable to attend school with his peers and has been isolated from his educational community. Furthermore, he has been prevented from participating in extracurricular and other nonacademic activities.

The Defendants have denied G.A. a FAPE due to the Defendants failing to provide program modifications or supports with an individualized Behavioral Intervention Plan (BIP) that was sufficiently informed on his disabilities. The Defendants have failed to provide G.A. with a FAPE by dismissing or ignoring his academic, developmental, and functional needs with developing in his Individualized Education Plan (IEP). Due to the Defendants failing to provide a FAPE, Plaintiffs sought out legal rememdies to resolve the special education disputes they had with the Defendants regarding their son, G.A.. On or about October 9, 2022, G.A's parents filed a Due Process Complaint. A pretrial hearing occurred on or about November 2, 2022, in which the parties established the issues which were to be heard in the Dur Process Hearing. On or about April 4, 2023, Plaintiffs filed a new Due Process Complaint against the District to address the new issues that arose between the parties at the latest IEP meeting, which included a proposed change in placement by the District of G.A.  On or about April 21, 2023, the lower court stated that the following issues would be heard at a consolidated Due Process hearing. The issues were as follows:

a. Did Respondent deny Student a FAPE by not appropriately providing for extracurricular and non-academic activities in Student's IEP?

b. To the extent that Student's IEP called for the provision of extracurricular and non-academic activities, did Respondent deny a FAPE to Student by not providing adequate modifications and supports for school personnel to allow Student to participate in extracurricular and non-academic activities?

c. Did Respondent deny Student a FAPE by failing to provide classroom assignments that would confer a meaningful educational benefit during the last two hours of the school day and/or by failing to offer sufficient sensory options to Student during the same time period?

d. Did Respondent deny Student FAPE by removing Student from community-based learning activities previously made available to Student?

e. Is Respondent's Behavioral Intervention Plan (BIP) for Student insufficiently detailed and/or insufficiently informed from a FASD disorder perspective to address Student's behaviors appropriately?

f. Were Respondent's personnel who have administered assessments and other evaluation materials used to assess Student sufficiently trained in FASD, or should Respondent's staff be required to undergo further training in FASD?

g. Did Respondent deny Student a FAPE by failing to consider and/or utilize assistive technology devices in developing and implementing Student's IEP?

h. Is Student denied a FAPE by Respondent's placement of Student in the Edison Max program pursuant to the April 4, 2023, IEP?

i. Did Respondent give sufficient and appropriate consideration to Petitioner's input, as required by the Individuals with Disabilities Education Act (IDEA), 20 USC 1400 et seq., during the April 4, 2023, IEP meeting?

j. For Student to receive a FAPE, does Student's disability require a private placement funded by Respondent? and

k. Is Respondent obligated under the IDEA to pay for a third-party educational consultant to evaluate placement of Student?

On or about August of 2023 the Parties conducted a Due Process Hearing which lasted approximately 5 days. The ALJ issued his Decision and Order on or about September 7, 2023 (Exhibit 21). Since the ALJ issued his decision, the Parties met for an IEP meeting on or about October 23, 2023 to allow the Parents to participate in the discussion of private placement of G.A. as instructed per the ALJ's Order. The

Parties were still unable to reach an agreement as to the educational placement of G.A. as the Defendants did not offer any other options other than Edison Max. Since November of 2023, G.A. has been placed in the most restrictive educational environment with homebound services. The Plaintiffs are appealing the ALJ's Decision for regarding the following issues:

a. Did Respondent deny Student a FAPE by not appropriately providing for extracurricular and non-academic activities in Student's IEP?
b. To the extent that Student's IEP called for the provision of extracurricular and non-academic activities, did Respondent deny a FAPE to Student by providing adequate modifications and supports for school personnel to allow Student to participate in extracurricular and non-academic activities?
c. Did Respondent deny Student a FAPE by failing to provide classroom assignments that would confer a meaningful education benefit during the last two hours of the school day and/or by failing to offer sufficient sensory options to student during the same time period?
d. Did Respondent deny Student a FAPE by removing Student from community-based learning activities previously made available to Student?
e. For Student to receive a FAPE, does Student's disability require a private placement funded by the Respondent?
f. Is Respondent obligated under the IDEA to pay for a third-party educational consultant to evaluate placement of Student?

## LEGAL ANALYSIS

## I. Violations of the Individual with Disabilities Education Act

During the Due Process Hearing, Plaintiffs presented evidence supporting their arguments related to eleven (11) questions to be decided by the Administrative Law Judge (ALJ). In summary, Plaintiffs asserted that the District had a responsibility to

ensure the same ability to participate with nondisabled peers in extracurricular and nonacademic activities, and that this was not properly provided to Student—a denial of his right to receive a Free and Appropriate Public Education (FAPE). They additionally contended that Student was not provided classroom assignments that would confer a meaningful educational benefit during the last two (2) hours of the school day, and that the District failed to offer sufficient sensory options to Student during that time. Also, Plaintiffs asserted that Student was denied a FAPE by his removal from community-based learning activities (also referred to as Community Based Instruction or "CBI"), and that the District's staff lacked appropriate and necessary training in the area of Fetal Alcohol Spectrum Disorder (FASD), which affected their ability to properly administer assessments, and create and implement Student's Behavior Intervention Plan (BIP). Lastly, Plaintiffs argued in hearing that Student was denied a FAPE by the District's placement of Student in the Edison Max program in the April 4, 2023, Individualized Education Program (IEP) Meeting, and that private placement of Student at public expense is appropriate based on the ways in which his disabilities manifest in education. The IDEA requires that qualifying children with disabilities receive a FAPE. 20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101(a). To achieve this goal, the IDEA and its implementing regulations require that school districts "design and develop an IEP for each qualifying child, with a statement of the special education and related services and

supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child...and a statement of the program modifications or supports for school personnel that will be provided for the child...to participate in extracurricular and other nonacademic activities...and educated and participate with other children with disabilities and nondisabled children in the activities." 20 U.S.C. §§ 1412(a)(4), 1414(d); 34 C.F.R. §§ 300.112, 300.320-24; 20 U.S.C. §§ 1414(d)(1)(A)(IV); 34 CFR §§ 300.107(a), 300.117.  In determining the educational placement of a child with a disability, the IDEA requires public agencies to ensure that the decision is made by a group of persons, including the parents and other individuals with knowledge about the child, evaluation data, and placement options; is made in a manner that conforms to the Least Restrictive Environment (LRE) provisions of the Act. Those making consideration must also consider any potential harmful effect on the child or on the quality of services that the student may need. Furthermore, the student is not to be removed from an age-appropriate regular classroom solely because of needed modifications in the general education curriculum.

Schools must ensure that "to the maximum extent appropriate, [that] children with disabilities...are educated with children who are nondisabled," and "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such

that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114(a). In *Endrew F. v. Douglas County School District* Re-1, 137 S. Ct. 988, 999 (2017), the Supreme Court defined a FAPE as an offer of education, "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." The Court further clarified that, in designing an IEP, "every child should have the chance to meet challenging objectives," and the IEP Team must give, "careful consideration to the child's present levels of achievement, disability, and potential for growth." *Id*. at 999, 1000.

In conducting an evaluation, the IDEA and its implementing regulations require school districts to, "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining . . . the content of a child's [IEP], including information related to enabling the child to be involved in and progress in the general education curriculum." 20 U.S.C. § 1412(b)(2)(A)(ii); 34 C.F.R. § 300.303(b)(2).

The ALJ in this case committed several errors of law by not considering several issues properly submitted for consideration, by misstating or mischaracterizing the evidence as presented during the Due Process Hearing. Additionally, he failed to

properly weigh the evidence in a manner that should have been consistent with the appropriate burden of proof, which is by the preponderance of the evidence.

**II.    Student Denied A Fape When Defendant Failed To Provide Services To Allow Student To Particapte In Extracurricular/Non-Academic Activities.**

G.A.  enjoyed participating in extracurricular activities such as weightlifting and soccer club. During the Due Process Hearing the Defendants acknowledged G.A. desire to participate in extracurricular activities. The Defendants further acknowledged that there were times when they denied G.A. the opportunity to participate in those activities. They admitted that their failure included ensuring that he had access to supplementary aids and supports including having a paraprofessional at a school dance. There were no supplementary aids or other supports specified in his IEP should such activities became available to G.A. Extracurricular activities that were denied to G.A. included but not limited to school dances, soccer club and weightlifting. As the ALJ points out in his opinion, 34 C.F.R § 300.107 and 34 C.F.R. § 300.117 requires that disabled students shall have an equal opportunity to have access to extracurricular activities (See ALJ Decision and Order, Exhibit 20). While the record showed that the Defendants did provide a paraprofessional, this support was not consistent nor appropriately implemented for G.A.  This is showed throughout the record. Ms. Shaughnessy, testified that the IEP team should have suggested extracurricular activities for this student. However, the

Defendants never included extracurricular activities in the IEP, even though M.A. informed the Defendant many times of G.A.'s desire to participate in extracurricular activities. Additionally, Defendants' witness Ms. Thornton, emailed M.A indicating that G.A. would not be able to participate in soccer club due to his "behavior". She testified that she did not observe G.A as being unsafe and that a behavior plan could be applied to the soccer club setting. (See Trial Tr. Vol 2, 243-244). Finally, the most compelling evidence that the Defendant failed to provide G.A. with a FAPE was regarding this sixth (6th) dance. Ms. Thornton emailed the entire classes' parents late in the evening the night before the dance. She indicated in her email that students would be able to get tickets for the dance the next day during the students' first hour classes. When M.A. emailed Ms. Thornton about the dance and inquiring if G.A. would have support, Ms. Thornton replied, "[Student] will not be able to attend the dance today. We do not have para support for him during this after school activity." (See Exhibit 3). Ms. Thornton further testified that after having a discussion with the principal, she realized that there would be no support or other services for G.A. to participate in the dance. The Defendants' witnesses acknowledged that they denied G.A. the opportunity to participate not only with the dance, but also with soccer club and weightlifting. Extracurricular activities where denied to G.A. Supporting evidence demonstrates that by a preponderance of the evidence the Defendants denied G.A. a FAPE when they denied him access to participate in extracurricular

activities on multiple occasions. The ALJ erroneously concluded that the record does not support a finding that the G.A. was denied a FAPE.

## III. Student Was Denied A FAPE When The Defendants Failed To Provide Class Assignments That Would Provide Student With A Meaningful Educational Benefit.

The ALJ erroneously concluded that the Defendants did not fail to provide G.A. with a FAPE, when the Defendants (1) did not provide G.A. with a meaningful educational benefit and (2) when they denied G.A. access to the sensory room, which was a part of his IEP. As indicted by the record, M.A. testified regarding classroom assignments as "was nothing that was even remotely close to what he could do." (See Trial Tr. vol. 1, 45). G.A. was not provided with classroom materials that would confer a meaningful educational benefit, as they were above his skill level and not offered for the times he was sent out of the classroom instead of properly implementing his behavior plan. In addition to raising these concerns about content appropriateness for G.A., M.A questioned the IEP team regarding the level of a math test that was beyond G.A.'s abilities. (See Exh. 5). As testified by expert Dr. Kenneth Lyons Jones during the due process hearing, students with FASD "can become dysregulated if the school content is above their abilities". (See Trial Tr. vol. 3, 320). The District failed to acknowledge and use an FASD-informed approach to help G.A. regulate his behaviors so that he could receive his meaningful education. Additionally, J.A and M.A. were concerned about the amount of time G.A. was sent

to walk the hallways throughout the school day, missing out on vital classroom material. The record shows through testimony by J.A. that G.A. spent more time walking the halls of the school instead of spending time in the classroom (See Exh. 14). This missed classroom time was not addressed by the Defendants. The Defendants failed to send class assignments home or communicate with J.A. or M.A. This is a clear violation of G.A.'s right to a FAPE. The Defendants acknowledge that they would deny G.A. the supportive tools that were provided for in his IEP, such as the sensory room. G.A.'s paraprofessional denied him access to the room because he did not "earn" it and this affected G.A.'s ability to regulate his disability (See Exh. 1). G.A. having access to the sensory room is a tool that is part of his IEP and is not something that is "earned" as if it is privilege. (See Trial Tr. Vol. 1, 92-93). This was a clear violation of G.A.'s right to a FAPE.

**IV. Student Was Denied A FAPE When Defendants Removed Student From A Community-Based Classroom Setting Which Was Previously Available To Student.**

During the 2021-2022 school year, G.A. benefitted from participation in Community Based Instruction (CBI), which included trips to the grocery store, museums, and other places where students could learn valuable skills for independence. The record shows that the Defendants acknowledged that G.A. enjoyed field trips that regularly occurred during the classroom that offered CBI. However, on or about March of 2022, G.A. was removed from the CBI classroom due to an incident that occurred

during a field trip that involved high school students and their staff. This incident is another example of how the Defendants denied G.A. a FAPE by creating an environment that would cause G.A. to dysregulate. This incident involved G.A. witnessing another student opening a bus window, which led to G.A. wanting to open his window. Instead of the CBI teacher managing her students and each of their behavioral needs, it was the high school teacher, who is unfamiliar with G.A., that attempted to address the situation. The situation was not properly managed which caused an escalation in G.A.'s behaviors which caused him to become dysregulated. The Defendants generalized their reason for G.A.'s removal from the CBI classroom as being rooted n G.A.'s behavior and his abilities being far above the other students in the class. While the IEP Team conferred on or about April of 2022, the Defendants unilaterally removed G.A. from CBI without input from J.A. and M.A. The Defendants did not place G.A. in a similarly situated classroom that would be beneficial to G.A.'s and address the content he was no longer receiving after being removed from CBI. Over time, Plaintiffs were called frequently to pick up G.A. from school due to him experiencing signs of dysregulation. Many times, these incidents were preceded by triggers known to cause dysregulation in children with FASD which included but were not limited to changes in schedule, changes in teachers, and the ineffective or inappropriate communication employed by the Defendants' staff which was directed at G.A. In fact, J.A. and M.A. sought solutions to the removal of

the CIB class from G.A. schedule. They attempted to explore other services through Life Lab, partial day programming, FASD training paid for by the Parents for the Defendants' staff, etc. However, the Defendants did not receive nor reciprocate these efforts.

**V. Defendants Denied Student A FAPE by Failing To Properly Train Staff On Student's Disability And Failing To Offer Programming in an FASD-Informed Manner.**

The ALJ erroneously concluded that Plaintiffs did not meet their burden of showing that the extent of the professional training by the Defendants' personnel, or the alleged lack thereof, rose to the level of a violation of the IDEA requiring a remedy. The Defendants were incapable or unwilling to provide G.A. with an FASD-informed education. While some members of the Defendants' staff testified as to their training on FASD, the ALJ failed to consider that at the time the complaints were filed by Plaintiffs, those trainings had not been completed. Further, the trainings that were attempted was wholly insufficient. It was only after the Due Process Complaint was filed that the Defendants' staff did the bare minimum of training—training which Plaintiffs' experts stated was completely insufficient and ineffective. Upon close examination of the "training" submitted by Defendants and testified to by their staff, it is evident that not only were these trainings attempted after the Due Process Complaint was filed, but they are also short online videos without any meaningful application strategies demonstrated or practiced. Some of

the "trainings" listed by Defendants were videos less than ten (10) minutes in length from the internet. The ALJ erred by dismissing or ignoring the testimony of Dr. Kenneth Lyons Jones, one of the first individuals to identify and coin the term "FASD". Dr. Jones testified that the terminology Defendants' staff used indicated a lack of sufficient training. He said to use the word "disruptive" or "defiant" when you talk about a child's behavior is a "pretty stigmatizing approach," because "the words we use and how we talk about this disorder...I'm becoming more and more aware is creating huge problems for these folks." (See Trial tr. vol. 3, 318-319). The ALJ dismissed or ignored evidence that demonstrated this lack of training on paper as well, in G.A.'s Behavior Intervention Plan. In Joint Exhibit 110, G.A. is referred to as "non-compliant" and "attention seeking," which frames G.A.'s behaviors as willful—something that requires a much different response than that trained in FASD best practices. The ALJ dismissed or ignored testimony from the District's staff which stated that ninety-one percent (91%) of the time, they would respond to G.A.'s behavior by "setting limits" with "if/then" statements—essentially, "if you do this, then we can do that"—also referred to in the Student's BIPs as "giving a choice." (See Trial Tr. vol. 1, 130-131; Joint Exh. 110). However, Mr. Dubovsky— who provides nationwide training and evidence-based practices on FASD to school districts—explained that "with other individuals we take the approach of they need to change their behavior and we need to come up with ways to have them decide to

change their behavior. So we use reward and consequence approaches...in FASD, what we need to do is modify their environment so that they can be successful, and it really is a different approach." (See Trial Tr. vol. 3, 289). The ALJ dismissed the evidence that showed Defendants provided the wrong "if/then" approach, which is not effective for students with FASD. Additionally, the ALJ did not properly consider how staff should have been trained to develop proper rapport in a manner that is effective for children with FASD. The ALJ erred by not considering how staff treating behavior as willful, with strategies to de-incentivize the behavior, is not effective when that area of the brain is damaged in G.A. and not based on intention. (See Trial Tr. vol. 2, 211). As cited in Plaintiffs' Closing Brief, Dr. Digioia stated that FASD trainings need to be "something more comprehensive" where you "have individuals that are certified and know about neurodevelopmental disorders" and is not "a half an hour or a half a day watching a video on your computer," because "it's going to change how you perceive this individual, how you interact with this individual, and the ways that you respond to the individual." (See Trial Tr. vol. 2, 187-188; Petitioners' Closing Brief, 19). Dr. DiGioia that explained it is "really difficult to work with an individual if you don't understand the challenges that they face" and that "what people see from the outside...is more of just, 'Oh, this person's oppositional,' or 'This person is defiant,'...but if you have somebody that really understands especially fetal alcohol spectrum disorder, they're going to have

different ways of dealing with that individual." (See Trial Tr. vol. 2, 169-170). Dr. DiGioia also testified that the basic training that all teachers receive is not enough when working with a student with FASD, and that training should be consistent or repeated over time. ( SeeTrial Tr. vol. 2, 192, 1-6). J.A. described an incident where Student requested to leave the gym to get some water, and a substitute teacher said he was not allowed to do so. Behind the teacher's back, Student made a "middle finger gesture." Instead of deescalating the situation, G.A.'s paraprofessional Alex went to the teacher and said, "[G.A.] has a message for you" and laughingly showed the teacher the gesture. (See Trial tr. vol. 2, 192). Mr. Dubovsky testified that inappropriate comments and behaviors like this are not uncommon in students with FASD due to damage in the brain and difficulty coping with even minor changes—like a change in teacher, which can cause an "over-release of cortisol." (See Trial Tr. vol. 3, 291; *Id.* at 1-292; *Id.* at 299). The Defendants' staff lacked sufficient and appropriate training to work with G.A., and instead of properly becoming educated in his disability and needs, they simply sent him to walk the hallways for hours on end. (See Exh. 14). As such, the ALJ erred in concluding that Plaintiffs' burden of proof had not been met.

VI. **For Student To Receive A Fape, His Disability Requires A Private Placement Funded By The District.**

The ALJ failed to address the issue pertaining to private placement at public expense. While the ALJ noted that J.A. and M.A. did not propose a specific private placement,

there was no time for them to seek options as they had been denied parental participation in the placement decision. Furthermore, it is the Defendants' responsibility to find and assess private placement on the placement continuum. G.A. requires private placement funded by the Defendants due to the Defendants' inability to provide him with a FAPE in another environment. Private placement for G.A. is the most appropriate long-term option for his educational needs. Experts, Dr. Kenneth Lyons Jones and Mr. Dan Dubrovsky, both testified that private facilities exist that have the correct environment for G.A. They indicated that these facilities have smaller classes, consistent environments, and staff who are trained and specialize in serving students with FASD. The Defendants are incapable of or unwilling to provide G.A. with an FASD-informed education. The Defendants refused to provide G.A. with an alternate school schedule that would be based on his needs as Dr. Figueroa had recommended (See Trial Tr. vol. 1, 20). Jan Lampman, a highly-regarded community program director who observed G.A. at Royal Oak Middle School, recommended that due to G.A's difficulties and disabilities he would benefit from a small, residential educational placement with expertise in FASD in order to meet his educational and mental health needs. At the time of the Due Process Hearing and shortly thereafter, the Defendants believed that Edison Max was an appropriate placement for G.A., however the Defendants failed to evaluate other facilities or accept input from J.A. and M.A. J.A and M.A disagreed with Edison

Max a proper placement for G.A. The Defendants unilaterally enrolled G.A. in Edison Max. Additionally, J.A. and M.A. required an answer regarding this issue as private placement is difficult to obtain when such facilties demand proof of ability to pay for admission.

**VII. The Defendants are Obligated Under the IDEA to Pay for a Third-Party Educational Consultant to Evaluate Placement for Student.**

The ALJ failed to address the issue regarding the Defendants requirement to pay for a third-party educational consultant to evaluate private placements for G.A. The ALJ left his opinion vague and ambiguous.

Date: October 1, 2024

/s/*Ashley B. Jacobson*

Ashley B. Jacobson (P83481)
Jacobson Law & Advocacy, PLLC
455 E. Eisenhower Pkwy Ste. 300
Ann Arbor, MI 48108
(248) 878-6940
Ashley@JLAPLLC.com