UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J.A. and M.A. o/b/o G.A.,                          Case No. 23-cv-13106

     Plaintiffs,                                  Hon. F. Kay Behm
v.                                                 United States District Judge

Royal Oak School District,                         Hon. Curtis Ivy, Jr.
                                                   U.S. Magistrate Judge
     Defendant.
_____ /

## OPINION AND ORDER ON IDEA APPEAL (ECF Nos. 26, 27)

## I.   PROCEDURAL HISTORY

Plaintiffs in this case are the parents of thirteen-year-old G.A.

("Student").  G.A. is eligible for special education and related services

under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C.

§ 1400 *et seq.*  Parents J.A. and M.A. disagreed with the terms of the

Individualized Education Program ("IEP") offered by Royal Oak Middle

School (ROMS) and filed a due process complaint against Defendant

Royal Oak School District (the District) challenging the IEP.  A due

process hearing was held in this matter in August 2023.  Plaintiffs filed

the instant action seeking review of the ALJ's decision on eight of the

issues presented in that court (IDEA appeal, Count I) as well as

bringing other claims under the ADA, Rehabilitation Act, and Michigan state law.  ECF No. 1.  Plaintiffs initially move for judgment on their IDEA appeal (ECF No. 26), and Defendant filed their own brief for judgment on the IDEA appeal as well (ECF No. 27).  For the reasons below, the ALJ's decision is **AFFIRMED**, the parents' appeal on the administrative record is **DISMISSED**, and the District's motion for summary judgment on the administrative record is **GRANTED**. Summary judgment is therefore granted to Defendant on Count I only.

## II.  FACTUAL BACKGROUND

G.A. attended Royal Oak Middle School (ROMS) for the 2021-22 and 2022-23 school years. See ECF 24-1, PageID.2373; *id.* at PageID.2412; *id.* at PageID.2484.  ROMS is a traditional campus with almost 1,200 students.  ECF 24-1, PageID.2158; ECF 24, PageID.1974.

G.A. was born with methadone in his system prior to his adoption by J.A and M.A.  ECF No. 26, PageID.2628.  Due to his addiction to illegal substances, he was diagnosed with neonatal abstinence syndrome at the start of his life.  He would later become diagnosed with a range of disabilities and medical conditions.  The range of disabilities and medical conditions include, but are not limited to, Fetal Alcohol

Spectrum Disorder (FASD), Anxiety, Attention Deficit Hyperactivity Disorder (ADHD), Reactive Attachment Disorder, Disruptive Mood Dysregulation Disorder, Sensory Dysregulation Disorder, and Executive Functioning Impairment.  *Id.*  G.A.'s disabilities manifest in many ways, including but not limited to lowered cognitive ability and difficulty with reading comprehension.  For example, standardized testing has consistently found him to perform below grade expectations.  Specifically, 2020 NWEA testing put G.A. at the 1st percentile for reading and math.  NWEA testing in Fall 2021 placed him at the 1st percentile in math and 11th percentile in reading.  ECF No. 24-1, PageID.2274.

G.A.'s disabilities also manifest as emotional dysregulation.  This included, for example, eloping from classrooms, wandering the halls during the school day, being physically aggressive toward other students and staff, and yelling curse words, which prevented him from being able to learn while attending ROMS.  ECF No. 24, PageID.1752.  Plaintiffs maintain that G.A. does not have the ability to exercise mental restraint when confronted with certain situations or triggers.

Academic records indicate a high frequency of absences throughout elementary and middle school.  ECF No. 24-1, PageID.2274.

At Student's April 2022 IEP meeting, the IEP team discussed a center-based program for Student as his behaviors were significantly impacting his learning and the learning of others.  *See* ECF 24-1, PageID.2412.  Center-based programming means that, if selected, the Student's education would be referred full-time to a center designed for students with special educational needs, rather than receiving "mainstreamed" education at a public high school.  *See* ECF No. 24, PageID.1968; ECF No. 24-1, PageID.2321.  Because the IDEA requires that students be educated in the "least restrictive environment" (LRE), the Act reflects a strong preference for mainstreaming.  *L.H. v. Hamilton Cty. Dep't of Educ.*, 900 F.3d 779, 788-89 (6th Cir. 2018).  That preference may be overridden where "(1) the student would not benefit from regular education; (2) any regular-class benefits would be far outweighed by the benefits of special education; or (3) the student would be a disruptive force in the regular class."  *Id.* at 789 (citation omitted).  The team ultimately decided to attempt "additional strategies, supports, and programming . . . prior to considering a more

restrictive environment." *Id.* at PageID.2437.  Student remained at ROMS for the 2022-23 school year, but the District-based members of his IEP team believed, and told Parents, that he may require center-based programming.  *Id.*

In October 2022, G.A's parents filed a Due Process Complaint addressing some of their disputes with ROMS and provision of a Free Appropriate Public Education (FAPE).  G.A. remained at ROMS at that time.

At Student's April 2023 IEP meeting, the IEP team returned to the issue of placement and the District-based members of the team made a formal offer of FAPE that included Student's placement at the Edison School, a center-based program dedicated to providing support to students whose behavior interferes with their learning. ECF 24-2, PageID.2485; ECF 24, PageID.1968.  Plaintiffs and their lawyer expressed their disagreement with Edison as the location for implementation of the IEP and wanted additional options, which the District did not provide, as it maintained that it had made its offer of FAPE.  *See* ECF 24-1, PageID.2095; ECF No. 24, PageID.1825.

In April 2023, Plaintiffs filed a second Due Process Complaint against the District to address the new issues that arose between the parties at the latest IEP meeting, which included the proposed change in placement to Edison Max. The Administrative Law Judge (ALJ) decided that the issues from the October complaint and the April complaint would be heard at a single consolidated Due Process hearing, which was conducted in August 2023. The ALJ issued his order in September 2023, which found for Defendant on many of the issues presented (including all of the issues raised in Plaintiffs' October complaint), but on two issues found for Plaintiffs, related to the placement decision in April 2023. Specifically, an educational placement decision for a child with a disability must be "based on the child's IEP." 34 C.F.R. § 300.116(b)(2). The IEP team that determines the educational placement decision for a child with a disability must include the parents of the child. 34 C.F.R. § 300.321(a)(1). To meet the goal of parental participation in the IEP process, "the school district was required to conduct, not just an IEP meeting, but a *meaningful* IEP meeting." *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 857 (6th Cir 2004) (emphasis in original), citing *WG v. Board of Trustees of*

6

*Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1485 (9th Cir. 1992).

Parents are denied meaningful participation when the school district's

placement decision has been predetermined before the IEP meeting is

held.  *Deal*, 392 F.3d at 857-858.  Merely having the parents present

and allowing them to speak at an IEP team meeting does not amount to

adequate participation if the school district members of the IEP team

are not prepared to listen to the parent's views with open minds.  *Id.*  If

nothing the parents could say would be able to affect the ultimate

placement decision, then the participation is "no more than after the

fact involvement."  *See Deal*, 392 F.3d at 848 (citing *Spielberg ex rel*

*Spielberg v. Henrico County Pub. Schls.*, 853 F.2d 256, 259 (4th Cir.

1988)).

Regarding the decision to place G.A. at Edison Max, the ALJ

found:

> Respondent predetermined Student's placement
> decision before the April 4, 2023, IEP team
> meeting and did not listen to Petitioners'
> concerns with open minds during the meeting.  It
> does not matter that Petitioners failed to propose
> a specific alternative placement.  It is not the
> obligation of the parents to come to an IEP
> meeting with a favored placement in mind. . . .

> The failure to allow Student's parents to meaningfully participate in the April 4, 2023, IEP team meeting was a procedural violation rendering void the resulting IEP. To correct this violation, and to determine the appropriate educational placement for Student, a new IEP meeting—at which Petitioners' view [sic] are afforded due consideration—will be necessary. To ensure that Petitioners' participation rights are protected as required, the next IEP team meeting must be facilitated by an independent facilitator who will be able to ensure that all IEP team members have the ability to meaningfully participate in deciding Student's educational placement.

ECF No. 24, PageID.1765.

In so deciding, the ALJ made no findings on the merits of the placement at Edison Max. Given his order to reconvene the IEP team with procedural safeguards to make the placement decision, "it would not be appropriate [] for this Tribunal to address the substantive merits of the placement decision set forth in Student's April 4, 2023, IEP. Nothing in this Decision and Order precludes the IEP team from determining at Student's next IEP meeting that Edison Max is the appropriate educational placement for Student." ECF No. 24, PageID.1766.

Since the ALJ issued his decision, the Parties met for an IEP meeting in October 2023 to allow the Parents to participate in the discussion of private placement of G.A. as instructed.  The parties were still unable to reach an agreement as to the educational placement of G.A., as Defendant allegedly did not offer any other options other than Edison Max.  ECF No. 26, PageID.2631-32.

It does not appear that Student attended Edison Max for very long, if at all, because at the time of filing Plaintiffs' brief, G.A. was receiving homebound services.  ECF No. 26, PageID.2629.  Per representations by Plaintiffs' counsel, G.A. is now at an out-of-state private placement of parents' choosing, which parents are paying for.

## III.  STANDARD OF REVIEW

The Individuals with Disabilities Education Act (IDEA or Act) offers States federal funds to assist in educating children with disabilities.  20 U.S.C. § 1400 *et seq.*; *see Arlington Central School Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 295 (2006).  In exchange for the funds, a State pledges to comply with a number of statutory conditions.  Among them, the State must provide a free appropriate public education—a FAPE, for short—to all eligible children.  § 1412(a)(1).

As part of providing a FAPE, school districts receiving funds under the IDEA are required to establish an IEP for each child with a disability. *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 762 (6th Cir. 2001) (citing 20 U.S.C. § 1414(a)(5)). The IEP must "contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress." *Id.* at 763 (citing 20 U.S.C. § 1401(a)(20)). "A child's IEP need not aim for grade-level advancement if that is not a reasonable prospect. But that child's educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 387-88 (2017).

When a child with a disability demonstrates behavior that impedes the child's learning or that of others, appropriate behavioral supports may be necessary to ensure that the child receives FAPE. The IEP Team must consider and when determined necessary for ensuring FAPE, include or revise behavioral supports in the child's IEP. 34 C.F.R. §§ 300.320(a)(4) and 300.324(a)(2)(i). Often, this comes in the

form of a Behavior Intervention Plan (BIP), but IDEA does not require specific programs or strategies so long as the IEP adequately identifies a student's behavioral impediments and implements strategies to address that behavior. *Enter. City Bd. of Educ. v. S.S.*, No. 1:19-cv-748-ALB, at *18 (M.D. Ala. June 12, 2020); *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 140 (2d Cir. 2013).

IDEA provides for a system of review and relief if parents believe that their child has been deprived of a FAPE. 20 U.S.C. § 1415. After complaining to the school district, an aggrieved parent may participate in a due-process hearing before an independent hearing officer of the local educational agency, which may then be appealed to the state agency. *Id.* § 1415(b)(2), (f)-(g). Any party aggrieved by the state administrative proceedings may then bring an appeal of that action in federal or state court. *Id.* § 1415(i)(2)(A); *C.K. v. Bd. of Educ. of Sylvania City Sch. Dist.*, No. 21-3244, at *34-35 (6th Cir. Sep. 9, 2022).

In an appeal of the due process hearing, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the

court determines is appropriate." § 1415(i)(2)(B).  The Supreme Court

has held that "due weight shall be given" to the administrative

proceedings.  *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982); *see*

*also Doe v. Bd. of Educ. of Tullahoma City Sch.*, 9 F.3d 455, 458 (6th

Cir. 1993) (district courts must apply a "modified de novo" standard of

review in IDEA appeals and "should give due weight to the state

administrative proceedings in reaching its decision") (internal

quotations and citation omitted).  In performing their task of

reexamining the evidence, district courts must not "substitute their own

notions of sound educational policy for those of the school authorities

which they review."  *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d

840, 849 (6th Cir. 2004) (internal quotations and citation

omitted).  "The amount of weight due to administrative findings

depends on whether the finding is based on educational expertise.  Less

weight is due to an agency's determinations on matters for which

educational expertise is not relevant because a federal court is just as

well suited to evaluate the situation."  *Id.*

## IV.  ANALYSIS

Where, as here, "parents challenge the appropriateness of a program or placement offered to their disabled child by a school district under the IDEA," courts conduct a "twofold inquiry" that first "ask[s] whether the school district has complied with the procedures set forth in the IDEA" (procedural compliance), and second asks "whether the IEP, developed through the IDEA's procedures, is reasonably calculated to enable the child to receive educational benefits" (substantive compliance). *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 763 (6th Cir. 2001).  As Defendant points out, there is no procedural claim in this appeal.  ECF No. 27, PageID.2656.

If the Act's procedural requirements "are met, greater deference is to be afforded to the district's placement decision." *Burilovich v. Bd. of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 566 (6th Cir. 2000) (quoting *Dong v. Bd. of Educ. of Rochester Cmty. Schs.*, 197 F.3d 793, 800 (6th Cir. 1999)).  Because Plaintiffs are "challenging the terms of [the] IEP," it is their "burden [to] prov[e] that the placement was not appropriate." *Dong*, 197 F.3d at 799; *see also C.K. v. Bd. of Educ. of*

*Sylvania City Sch. Dist.*, No. 21-3244, 2022 U.S. App. LEXIS 25360, at

*36 (6th Cir. Sep. 9, 2022).

For the sake of trying to create some amount of continuity with

the administrative record (and ease of reference), the court uses the

same letter designations for the issues as in both Petitioners' and

Respondent's Closing Briefs before the ALJ.  *See* ECF No. 24,

PageID.1870; ECF No. 24, PageID.1829.

### A & B.      Extracurricular Activities

The first two issues on appeal present the following two questions:

- Did Respondent deny Student a Free Appropriate Public
  Education (FAPE) by not appropriately providing for
  extracurricular and nonacademic activities in Student's
  Individualized Education Program (IEP)?

- To the extent that Student's IEP called for the provision of
  extracurricular and non-academic activities, did Respondent
  deny a FAPE to Student by [not] providing modifications and
  supports for school personnel to allow Student to participate in
  extracurricular and non-academic activities?

ECF No. 24, PageID.1760 (ALJ's order); ECF No. 26, PageID.2636

(appeal); ECF No. 27, PageID.2657 (response).

As to the first question, the ALJ found that "Petitioners have not

offered any evidence explaining how any specific extracurricular

activity was necessary for Student to have an opportunity to receive an

appropriate education."  ECF No. 24, PageID.1761.  As to the second,

the ALJ found that they failed to show "that Student was denied equal

access to nonacademic activities."  *Id.*

### i.   Whether the IEP should have included extracurricular activities

It is undisputed that Student's IEPs did not specify that Student

must be allowed to participate in any specific extracurricular activity.

The ALJ found that Plaintiffs "have not met their burden, however, of

proving that participation in any specific extracurricular activity was

necessary for Student to receive a FAPE."  In this appeal, Plaintiffs do

little to dislodge that finding.  What Plaintiffs' appeal brief mostly

argues instead is that Defendant failed to provide equal access for G.A.

at extracurricular activities, and the court addresses that issue in the

next section.  The only statements directly on point to the issue of

whether the IEP should have addressed extracurriculars are that "Ms.

Shaughnessy[] testified that the IEP team should have suggested

extracurricular activities for this student" and "M.A. informed the

Defendant many times of G.A.'s desire to participate in extracurricular

activities."  ECF No. 26, PageID.2636.  In light of other evidence that

Student became more dysregulated in the afternoons (*e.g.* ECF No. 24-1, PageID.2092), only sometimes attended organized after-school activities in any event (ECF No. 24-1, PageID.2152, ECF No. 24, PageID.2033), that M.A. and J.A. had asked for shortened school days (ECF No. 24-1, PageID.2085), and that M.A. and J.A. had not asked for extracurriculars to be put in the IEP at the April 2022 meeting (ECF No. 24-1, PageID.2151), the ALJ did not err in concluding that the preponderance of the evidence did not show a denial of FAPE by generally not including extracurricular activities in the IEP.

With that said, it is a requirement of the IDEA that an IEP must explain the extent, if any, to which the child will participate with nondisabled children in extracurricular and other nonacademic activities. 20 U.S.C. § 1414(d)(1)(A)(i)(V); 34 C.F.R. § 300.320(a)(5). Plaintiffs brought this up in their closing brief to the ALJ. ECF No. 24, PageID.1808. As far as the court can tell, Defendant never truly disputed that point. Defendant argues instead that not providing those services in an IEP does not equate to a denial of FAPE, but it seems to the court that the parties are talking past each other. Plaintiffs appear to be pointing out a procedural or technical defect of the IEP; Defendant

jumps to the substantive conclusion about whether G.A. received a FAPE.  The failure to include anything about extracurriculars in an IEP is a technical issue that does not render the IEP invalid absent substantive effect.  *Doe v. Defendant I*, 898 F.2d 1186, 1190 (6th Cir. 1990) ("the procedural safeguards afforded to parents . . . refer[s] to the process by which the IEP is produced, rather than the myriad of technical items that must be included in the written document") (emphasis omitted); *Dong ex rel. Dong v. Bd. of Educ.*, 197 F.3d 793, 800 (6th Cir. 1999) ("While we strictly review an IEP for procedural compliance, technical deviations do not render an IEP invalid."); *see also Rettig v. Kent City Sch. Dist.,* 788 F.2d 328, 332 (6th Cir. 1986) (holding that if a student is unable to benefit educationally from extracurricular activity, the school district is not required under the IDEA to provide such a service to the student in his IEP).

The court is left to agree with both parties; the IEP should have included a statement about G.A.'s participation in extracurricular activities, but did not.  However, the failure was merely technical because, as explained below, G.A. was generally provided with equal opportunity to access extracurricular activities, and the single occasion

he was denied the ability to attend a school dance is not on its own sufficient to show denial of FAPE.

### ii.   Whether G.A. was afforded an equal opportunity to participate in extracurricular activities

The IDEA's implementing regulations require that disabled students have equal access to extracurricular activities. *See* 34 C.F.R. § 300.107; 34 C.F.R. § 300.117. However, in the context of providing a FAPE and what must be included in a student's IEP, the Sixth Circuit has held that those regulations do not require strict equality of opportunity. *Rettig v. Kent City Sch. Dist.*, 788 F.2d 328, 332 (6th Cir. 1986) (citing *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176 (1982)). In order to provide a FAPE, school district is only obligated to account for extra-curricular activities to ensure the student on the whole receives meaningful educational benefit from his IEP. *Id.* at 332; *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 862 (6th Cir. 2004).

Plaintiffs argue that G.A. was denied equal access to three activities: weightlifting club, soccer club, and a school dance. The ALJ found that Plaintiffs did now show that "Student was denied equal

access to nonacademic activities." ECF No. 24, PageID.1761. The court finds that only the contention as to the dance has merit, and so the technical failure to account for extracurricular activities in the IEP did not amount to a substantive denial of FAPE.

### a.   *Weightlifting*

The ALJ found that "the record established that Respondent arranged for and paid for a paraprofessional to be available as needed for Student to participate in the weightlifting club." ECF No. 24, PageID.1761. G.A. did not attend the club regularly, but went a "very few" times. ECF No. 24, PageID.1990. As needed on those occasions, the Student's resource room special education teacher, Bryan Stefan,[1] arranged for Student to have one-on-one staff support to attend weightlifting club. ECF No. 24, PageID.1761 (citing ECF No. 24, PageID.2033-34, 2039, 1990) (testimony that there was never a time G.A. needed para support at weightlifting and it was not provided). The record supports that finding, and the ALJ did not err in so concluding. *See* ECF No. 24-1, PageID.2229, 2234 (emails with Stefan, establishing

---

[1] The court uses the spelling that he apparently provided the court reporter, *see* ECF No. 24, PageID.2030, but elsewhere in the record his last name is spelled "Stefen." *See, e.g.*, ECF No. 24, PageID.1756.

para support and supervision at weightlifting on various dates).

Plaintiffs' sole argument on this point, that "Defendants' witnesses

acknowledged that they denied G.A. the opportunity to participate not

only with the dance, but also with soccer club and weightlifting."

(without record citation), is not sufficient to dislodge the ALJ's record-

supported finding.

> b.    *Soccer*

Regarding soccer, the ALJ found:

> Student was also allowed to attend soccer club
> until he became too physically aggressive toward
> other students in a manner that was not safe.
> Precluding Student from attending a club after
> his behavior posed a danger to other students did
> not deny Student equal access to the activity.
> Presumably, any other student would be
> precluded from attendance for engaging in
> similar unsafe behavior.  Petitioners did not offer
> any credible evidence to show that soccer club
> could have been made safe for both Student and
> the other participants.

ECF No. 24, PageID.1761.

On appeal, Plaintiffs say only: "Defendants' witness Ms. Thornton,

emailed M.A indicating that G.A. would not be able to participate in

soccer club due to his 'behavior'.  She testified that she did not observe

G.A as being unsafe and that a behavior plan could be applied to the

soccer club setting."  ECF No. 26, PageID.2637 (citing ECF No. 24-1,

PageID.2098); ECF No. 24-1, PageID.2324 (email referenced).  While

technically true, Thornton also testified that "I don't run the club, so the

two special-ed teachers that ran the club came to me and explained that

to keep the other students safe and G.A. safe that he wouldn't be able to

attend because he was physically aggressive."  ECF No. 24-1,

PageID.2098.  No evidence shows that other students would be allowed

to come back to the club after similar behavioral issues, nor does

controverting evidence exist to say that G.A. was not physically

aggressive toward other students.  Given the dearth of evidence on this

point, the court defers to the judgment of school officials in what

amount of unsafe behavior can be accommodated in a soccer club, and

the ALJ did not err in concluding that the preponderance of the

evidence presented showed no violation of equal access to that activity.

*c.*     *School Dance*

The final issue presented by the parties is a school dance.  On May

6, 2022, Amy Thornton, a support teacher at ROMS, advised Petitioner

M.A. by email that Student would not be able to attend a dance at the

school that afternoon/evening because Respondent did not have

21

paraprofessional support available for Student at the event.  ECF No.
24-1, PageID.2152 (testimony); ECF No. 24-1, PageID.2325 (email
itself).  The ALJ found that Plaintiffs failed to show that "Student was
denied equal access to nonacademic activities" because although "[G.A.]
was unable to attend a school dance on one occasion because no
paraprofessional support was available that evening[, s]tudent's
inability to attend one school dance does not amount to a denial of
FAPE."

The court sees this issue as conflating two slightly different
problems – the first being an equal access issue, and the second being
whether a denial of equal access to a specific activity is the same as
denial of FAPE.[2]  They are different; the test for denial of FAPE does
not ask about specific activities, necessarily, but is a birds-eye view
question of "whether the IEP, taken in its entirety, is reasonably

---

[2] The court notes that the parties appeared to dispute whether the question
of equal access under the implementing regulations was properly before the ALJ,
and the ALJ appears to have mostly confined his inquiry to the FAPE question
under IDEA.  The alternative view is that the implementing regulations raise
claims under the Rehabilitation Act and not under the IDEA.  Whether the ALJ had
jurisdiction over the equal access issue is irrelevant here; this court can exercise
jurisdiction over that equal access claim, whichever statute it arises under, and the
parties have presented their arguments in their briefs.  *See Meares v. Rim of the
World Unified Sch. Dist.*, 269 F. Supp. 3d 1041, 1059 (C.D. Cal. 2016) (examining
the same issue).

calculated to enable the particular child to garner educational benefits."
*Meares v. Rim of the World Unified Sch. Dist.*, 269 F. Supp. 3d 1041,
1053 (C.D. Cal. 2016) (citing *Rowley*, 458 U.S. at 203-04, 207); *Rettig v.
Kent City Sch. Dist.*, 788 F.2d 328, 332 (6th Cir. 1986) ("[T]he applicable
test under *Rowley* is whether the [] child's IEP, when taken in its
entirety, is reasonably calculated to enable the child to receive
educational benefits."); *see also Lessard v. Wilton Lyndeborough Coop.
Sch. Dist.*, 518 F.3d 18, 30 (1st Cir. 2008) ("Were the law otherwise,
parents could endlessly parse IEPs into highly particularized
components and circumvent the general rule that parents cannot
unilaterally dictate the content of their child's IEP.").

If there was no denial of equal access to the dance in the first
place, then there could be no question of denial of FAPE at all, so the
court starts there.  The ALJ briefly concluded that the evidence
surrounding the dance was insufficient to show a denial of equal access
under 34 C.F.R. §§ 300.107(a) and 300.117.  In this court's view, that
(admittedly limited point) was error.  Unlike whether a particular
extracurricular must be in a student's IEP, "[b]y the plain terms of the
regulation, access is not contingent on whether it confers an educational

23

or instructional benefit, as IDEA's FAPE requires, but only on whether the activity is appropriate for the student." *Meares*, 269 F. Supp. 3d at 1056-57. Here, though, the ALJ did not find that the dance would have been inappropriate for G.A. to attend, and the court likewise does not find that.

According to the school's email to parents, students would receive tickets to the dance from their first-period teacher on Friday morning. ECF No. 24-1, PageID.2326. M.A. emailed on the Friday morning to say G.A. would be out that morning for an appointment, so she asked that someone could get his ticket for him. ECF No. 24-1, PageID.2325. A staff member replied, saying G.A. would not be able to attend the dance. *Id.* The only reason given was that the school did not have para support for that activity. *Id.* However, the email to parents explaining how to claim a ticket was only sent at 9:20 p.m. the night before, so M.A.'s morning-of email can hardly be considered an untimely request for a ticket. ECF No. 24-1, PageID.2326. The school was obviously on notice of G.A.'s general need for para support at school activities, so the plain inference is that the school assumed that G.A. would not attend the dance or would not be able to attend the dance, but their

assumption does not merit deference in light of the duties imposed by federal regulation, and in light of G.A.'s semi-regular attendance at after-school activities.  *See* ECF No. 24, PageID.1756.  It appears that in cross-examination, Defendant suggested that M.A. should have offered to chaperone the dance to ensure G.A. could come – but since presumably, no other student is obliged to provide their own parent as a chaperone, that would seem to try to improperly shift the burden to G.A.'s parents to guarantee access, rather than the school.

To be fair, Amy Thornton, the support teacher, testified that G.A. did best in settings with a small number of students, that he has trouble regulating around his peers, that afternoons were hard for him, that she thought going to the dance was not a good idea, and that she had concerns about his safety.  ECF No. 24-1, PageID.2101.  But she also did not appear to assess possible modifications, supports or other aids that would allow him to participate.  *Id.*; ECF No. 24-1, PageID.2098.  And for example, G.A. went to the lunchroom each day, surrounded by many peers, and the school usually managed to make that work with support staff.  ECF No. 24, PageID.2033.  Whether or not "school dances" were in G.A.'s IEP, the school independently had

25

the responsibility of ensuring some measure of equal access, as they did

for other activities.  *See Popson v. Danbury Local Sch. Dist.*, No.

3:04CV7056, 2005 U.S. Dist. LEXIS 46429, at *12 (N.D. Ohio Apr. 28,

2005) (though under state law, student did not attend a school camping

trip or swimming party when she did not receive notice of the activities

because she did not attend morning homeroom, and the court would

have found her equal opportunity claim survived summary judgment

had the parties not settled that claim).  Whatever equal access means in

the context of a school dance, it must mean more than simply

announcing that no support was available.  On the evidence available,

the ALJ could not have concluded by the preponderance of the evidence

that the school made any reasonable effort to ensure equal opportunity

to attend, because the record showed no effort at all.

However, setting aside the question of equal access to the dance,

this court nonetheless agrees with the ALJ that Plaintiffs did not

establish by a preponderance of the evidence that denial of access to a

single school dance was a denial of FAPE when the school was also

providing, for example, one-on-one paraprofessional support throughout

the school day, conducted functional behavior assessments, modified his

26

BIP to try and address behavioral issues, provided occupational therapy, sensory breaks, speech and language services, social work services, and generally ensured his access to other after-school activities such as weightlifting.  ECF No. 24, PageID.1753; *see, e.g.*, *Meares*, 269 F. Supp. 3d at 1053 (no FAPE violation for failure to provide aide for mountain biking club, even though violation of equal opportunity to participate in club); *see also Sneitzer v. Iowa Dep't of Educ.*, 796 F.3d 942, 951 (8th Cir. 2015) (district's refusal to place student in particular show choir did not amount to denial of FAPE).  The test is whether the child's IEP, when taken in its entirety, is reasonably calculated to enable the child to receive meaningful educational benefits.  *Rettig v. Kent City Sch. Dist.,* 788 F.2d 328, 332 (6th Cir. 1986); *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 862 (6th Cir. 2004).  This single instance of being denied access to a one-time extracurricular is insufficient to show that the IEP, taken in its entirety, did not meet the Act's requirements.

**C.     Classroom Assignments & Sensory Options During**

**Last Two Hours of the Day**

Next, Plaintiffs argue that G.A. was denied access to classroom

assignments, meaningful educational benefit, or sensory options at the

end of the school day.  The issue before the ALJ was phrased:

- Did Respondent deny Student a FAPE by failing to provide classroom assignments that would confer a meaningful educational benefit during the last two hours of the school day and/or by failing to offer sufficient sensory options to student during the same time period?

The ALJ found that Plaintiffs failed to meet their burden of proof,

because:

> [T]here was almost no evidence admitted at the hearing about "sensory options".  Petitioner submitted one email from M.A. to the principal containing an allegation from Student that his paraprofessional would not let him go to the sensory room on September 14, 2022, because "he didn't earn it".  Mr. Stef[a]n testified, on the other hand, that Student *was* offered "sensory options" when he chose to leave class, and that Student sometimes chose to use them.  He also testified credibly that Student was typically allowed to use the school gym "almost any time he wanted to".

ECF No. 24, PageID.1761 (record citations omitted).

The ALJ went on to say that:

> It is the obligation of a school district to make a FAPE "available" to a student; it is not the obligation of a school district to guarantee that a student absolutely receives a FAPE. *See* 34 CFR § 300.1(a); 34 CFR § 300.101(a). Respondent was aware of the problem of Student walking the halls and took steps to try to alleviate the problem. Respondent provided Student with a one-to-one paraprofessional for his entire school day. The paraprofessional followed Student and attempted to redirect Student to his classes (but could not physically force Student to sit in a classroom). (Ex. 115.) Respondent put a BIP in place and modified it multiple times. The fact that Student frequently was not engaged with his class work, without more, does not establish a denial of FAPE.

In this appeal, Plaintiffs do not give the court sufficient reasons to second-guess the ALJ's determination. Plaintiffs argue that M.A. testified that G.A. was not provided with classroom materials that would confer a meaningful educational benefit, as, in their view, they were above his skill level, and students with FASD "can become dysregulated if the school content is above their abilities." Plaintiffs also argue that G.A.'s missed classroom time spent walking the halls was not sufficiently addressed by Defendant. And lastly, Plaintiffs focus again on the testimony that on one occasion, G.A.'s

paraprofessional denied him access to the sensory room because he did not "earn" it.  ECF No. 26, PageID.2638-39.

The ALJ addressed all these points already, and Plaintiffs do not meaningfully dispute the findings made.  Regarding the difficulty of classroom content, the ALJ found that "Petitioners offered a conclusory email from M.A. to Student's math teacher asserting that the math problems given to Student during a first hour class on March 10, 2022, were 'far beyond his understanding.'  No evidence was presented about the substance of the math problems in question."  ECF No. 24-1, PageID.2330.  The ALJ did not err in concluding that M.A.'s own email and testimony was insufficient to carry Plaintiffs' burden, particularly in light of contravening evidence.  *See* ECF No. 24-1, PageID.2328 (email from Amy Thornton, a support teacher, indicating the work, which was a progress-monitoring exercise, was at G.A.'s learning level).  Nor did the ALJ err in concluding that, although there was evidence showing that G.A. ended up walking the halls when he became dysregulated, there was no evidence presented to connect that habit with any lack of sensory options or with inappropriate classroom assignments during the later part of the day.  *See* ECF No. 24,

PageID.1762.  In regard to the sensory room, the ALJ clearly considered the testimony that on at least one occasion, G.A. was denied access to the sensory room, and weighed it against other available testimony (such as that found at ECF No. 24, PageID.2032), and found that the preponderance of the evidence supported Defendant's position that that was a single occasion compared to the general practice that G.A. was able to "regularly" use the sensory room.  Finally, because there was no evidence that the classroom work was not designed to ensure G.A. "made appropriate progress during the school year," the ALJ did not err by concluding that a FAPE was available to G.A.  A FAPE must be "reasonably calculated" to enable a child to succeed; a child's disengagement with appropriate classroom work that has been reasonably calculated for their needs does not, standing alone, establish a denial of a FAPE.  *See Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 394, 137 S. Ct. 988, 995-96 (2017) ("a child has received a FAPE[] if the child's IEP sets out an educational program that is 'reasonably calculated to enable the child to receive educational benefits.'") (internal citation omitted).  The ALJ found that Defendant provided G.A. with a one-to-one paraprofessional for his entire school

day: "[t]he paraprofessional followed G.A. and attempted to redirect him to his classes (but could not physically force Student to sit in a classroom).  Defendant put a BIP in place and modified it multiple times.  The fact that Student frequently was not engaged with his class work, without more, does not establish a denial of FAPE."  ECF No. 24, PageID.1762.  That finding was not erroneous in light of the evidence.

### D.   Removal From Community-Based Learning

Petitioners assert that Respondent's decision to remove Student from community-based learning activities was a denial of FAPE:

- Did Respondent deny Student a FAPE by removing Student from community-based learning activities previously made available to Student?

The ALJ described the relevant facts as follows:

> [F]or most of his 6th grade year, Student was placed in Hannah Connelly's class for the fifth and sixth hour of the day.  Ms. Connelly taught a self-contained Level 3 Program for around ten cognitively impaired students who were with her all day.  Student was not cognitively impaired and was not part of Ms. Connelly's self-contained program.  Instead, Student's October 19, 2021, IEP put him in Ms. Connelly's classroom for part of the school day.  During this period, Student would sometimes join Ms. Connelly's class on community-based outings to the grocery store, library, or credit union.  Student's presence was disruptive to Ms. Connelly's CI students, because

he would not follow directions, including safety rules.  Both Ms. Connelly and Melanie Davis testified credibly that Student's adaptive and independent living skills were at a more advanced level than the CI students fully enrolled in Ms. Connelly's self-contained Level 3 Program. Because Student had "demonstrated social, academic, [and] adaptive skills higher than the needs of Level 3 programming" the April 11, 2022, IEP removed him from being in Ms. Connelly's classroom for any part of the school day.

Petitioners have failed to establish that Respondent's decision to take Student out of Ms. Connelly's classroom—which was not suited to his needs—amounted to a denial of FAPE. Because of Student's significant behavior problems, accessing the curriculum at ROMS was a constant challenge for him.  Under the circumstances, having Student spend five to six hours per week out of place in an otherwise self-contained program for cognitively impaired students, beneath his adaptive skill level, would not have been a decision reasonably calculated to enable Student to receive an educational benefit.

ECF No. 24, PageID.1762-63.

Plaintiffs, for their part, allege that the incident about not following "safety rules" involved G.A. witnessing another student opening a bus window, which led to G.A. wanting to open his window. "Instead of the CBI teacher managing her students and each of their behavioral needs, it was the high school teacher, who is unfamiliar with

G.A., that attempted to address the situation.  The situation was not properly managed which caused an escalation in G.A.'s behaviors which caused him to become dysregulated."  ECF No. 26, PageID.2640 (referencing ECF No. 24-1, PageID.2358).  Additionally, "[w]hile the IEP Team conferred on or about April of 2022, the Defendants unilaterally removed G.A. from CBI without input from J.A. and M.A. The Defendants did not place G.A. in a similarly situated classroom that would be beneficial to G.A.[] and address the content he was no longer receiving after being removed from CBI."  *Id.*

The April, 2022 IEP meeting addressed these points and shows that the parents' input was considered at the meeting.  The report from that IEP meeting noted that Plaintiffs M.A. and J.A. "believe that Level 3 programming is the most appropriate placement for [G.A.] and a setting in which he can be successful."  ECF No. 24-2, PageID.2415. However, the report also noted in regard to the Level 3 program:

> Mrs. Connelly recently shared that [G.A.] is often absent for Level 3 class and will often only be present when the class is going on a community based instruction trip or practicing a daily living skill such as cooking.  Often when we transition to academic instruction, he will elope the classroom or take a break where he does not return.  During community based instruction or

class field trips, [G.A.] often exhibits unsafe
behavior that disrupts other students.  When
given a basic directive by an adult (put your
phone away, sit down, keep walking, etc.), he will
often become defensive to the adult giving the
directive and refuse.  Often the directive is a
safety concern that [G.A.] has refused to follow.
During CBI trips or field trips, he has become
defensive with Royal Oak staff and community
members using inappropriate language and name
calling.  When out in the community, [G.A.] will
be on his device making phone calls and taking
pictures/videos.  When asked to stop, he often will
refuse or protest the directive.

*Id.* at PageID.2422.

And still referring to that program: "[d]uring Community Based

instruction the student [G.A.] exhibits mastery in the skill sets being

taught.  Due to this the student seems unengaged in the instruction

given by staff.  Limited to no engagement in the instruction causes the

student to walk out of class unannounced most days."  *Id.*  During trips

to the grocery store, his "skills are much more developed than other

students attending CBI trips."  *Id.* at PageID.2424.  However, "CBI

trips to the library, walks around the community, and Level 3 field trips

to the museum are not as successful.  [G.A.] can not successfully

participate in these activities due to emotional and behavioral

dysregulation."  *Id.*  So, although the school acknowledged the parents'

request, their plan did not include CBI because, the plan concluded, "[G.A.] has demonstrated social, academic, adaptive skills higher than the CBI needs of Level 3 programming." *Id.* at PageID.2437.  Further, G.A. was never part of the full Level 3 program, but just accompanied the group on the occasional field trip / community outing, and only when G.A. wanted to join (G.A. opted out or refused to attend when it was an activity he did not want to do, such as walking to the bank). ECF No. 24-1, PageID.2102.  Thornton, a support teacher who worked with G.A., testified that sending him on field trips with a group he did not regularly attend class with, with a teacher he was not in class with, may have contributed to his dysregulation those days.  ECF No. 24-1, PageID.2103.  It was not error to conclude that the preponderance of the evidence supported the finding that the student's IEP did not need to include the specific provision that G.A. be able to attend outings of the Level 3 class on an ad-hoc basis in order to provide him with a FAPE.  Nor was it error to conclude that, setting aside the single instance of a high school teacher's involvement in disciplining G.A., the preponderance of the evidence still supported a change in G.A.'s IEP for other unrelated instances of dysregulation.  Remaining in a program for

which G.A. had demonstrated skills above the level of the educational material, which itself was judged to contribute to his dysregulation on the trips he attended, would not be "reasonably calculated" to ensure G.A. continued to receive meaningful educational benefits, and therefore not a denial of a FAPE.  *See* ECF No. 24, PageID.1763.

Nor does the allegation that no "similarly situated classroom" was identified for Student establish an IDEA violation.  Plaintiffs cite no authority for the proposition that Royal Oak was required to provide a "similarly situated" community-based instruction appropriate for G.A.'s level of functioning, particularly when the testimony indicated that no available "similarly situated" community-based instruction existed for higher-functioning students.  *See* ECF No. 24-1, PageID.2099.

Admittedly, Plaintiffs' allegation that "Defendants unilaterally removed G.A. from CBI without input from J.A. and M.A." seems to raise procedural concerns.  *See Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 857 (6th Cir. 2004) (predetermination of a particular program amounted to a procedural violation of the IDEA because it effectively deprived the parents of meaningful participation in the IEP process and therefore deprived the student of a FAPE).  But in light of the evidence

showing that J.A. and M.A.'s preference was considered (though

rejected) by the IEP team, this single statement is not enough to carry

their burden at this stage or at the administrative stage.  This also

appears to be a new argument not brought before the ALJ, which is not

proper; while additional evidence may be considered, a plaintiff in

an IDEA case is generally not free to raise new arguments for the first

time on appeal.  *E.C.D. v. San Diego Unified Sch. Dist.*, No. 23-cv-303,

2025 U.S. Dist. LEXIS 13128, at *23 (S.D. Cal. Jan. 24, 2025) (collecting

cases).  If a primary problem with the removal from the Level 3

classroom was the procedural process at the annual IEP review, that

claim should have been first brought before the ALJ and cannot now be

presented as a new argument.

### E.    Behavioral Intervention Plan

Petitioners assert that Student's BIP was not sufficiently FASD-

informed:

> • Is Respondent's Behavioral Intervention Plan (BIP) for
> Student insufficiently detailed and/or insufficiently informed
> from a Fetal Alcohol Spectrum Disorder (FASD) perspective
> to address Student's behavior appropriately?

Pursuant to 34 C.F.R. § 324(a)(2)(i), when a child's behavior

impedes learning, the IEP team must "consider the use of positive

behavioral interventions and supports, and other strategies, to address

that behavior."  Consequently, G.A. had a BIP developed by his IEP

team which was periodically updated.  *See* ECF No. 24-2, PageID.2406;

*id.* at PageID.2470; *id.* at PageID.2475.

The ALJ concluded that Defendant met its duty to consider

behavioral interventions and gave "due respect to the input of the

independent evaluation requested by Petitioners."  ECF No. 24,

PageID.1763.  He found:

> The evidence does not support a conclusion about
> what an FASD-informed BIP for student should
> look like.  In addition to ARND, Student had
> diagnoses of ODD, sensory processing disorder,
> ASD, RAD, and DMDD.  Respondent's expert, Dr.
> Shapiro, testified credibly that it would be
> impossible to attribute one of Student's behaviors
> to any of his specific diagnoses or risk factors.
> Accordingly, rather than focus on one of Student's
> conditions, it was appropriate for Respondent to
> focus on Student's behaviors themselves when
> crafting the BIP.

ECF No. 24, PageID.1763.

Plaintiffs argue the ALJ erred by crediting the testimony of

Defendant's experts (implicitly over some of the testimony of Plaintiffs'

experts).  ECF No. 26, PageID.2641-44.  This court is obligated to give

"due weight" to the factual findings made in the state administrative

proceedings.  *N.L. v. Knox County Schs.*, 315 F.3d 688 (6th Cir. 2003).

An IDEA hearing officer is not required to offer a detailed explanation

of his credibility assessment, and that assessment is entitled to

deference.  *J. P. v. Cty. Sch. Bd.*, 516 F.3d 254, 261 (4th Cir. 2008); *Cty.*

*Sch. Bd. v. Z.P.*, 399 F.3d 298, 307 (4th Cir. 2005).  The ALJ's decision

makes it clear that he credited Defendant's expert, implicitly over the

testimony of Plaintiffs' experts, and that finding was not clearly

erroneous.  He ended up crediting the explanation that G.A. has many

diagnoses, and therefore it is difficult to isolate the cause of any one

behavior to FASD.  *See* ECF No. 24-1, PageID.2078 (many of Student's

diagnoses overlap); ECF No. 24, PageID.2029 (interventions for FASD

focuses on treating the symptoms).  Considering the ambiguity of what,

exactly, an FASD-informed BIP would look like, the ALJ did not err in

concluding that the school had sufficiently incorporated training on

FASD and that they satisfied the IDEA by focusing the BIP on

addressing the specific behaviors they observed.

### F.    Staff Training on FASD

Plaintiffs also argued that "Student has been assessed and
evaluated by persons not sufficiently trained in FASD."  ECF No. 24,
PageID.1763.  The issue posed:

- Were Respondent's personnel who have administered
  assessments and other evaluation materials used to assess
  Student sufficiently trained in FASD, or should
  Respondent's staff be required to undergo further training in
  FASD?

The ALJ found that Plaintiffs failed to meet their burden of proof
on this point, because the evidence established that at least some of
Defendant's personnel who worked with Student had received at least
some training specifically on FASD.  He found that the evidence
"demonstrated that all personnel working with Student possessed the
appropriate professional education, training, and certifications to
perform their jobs providing special education services.  Petitioners
have not met their burden of showing that the extent of the professional
training by Respondent's personnel, or the alleged lack thereof, rose to
the level of a violation of the IDEA requiring a remedy."  ECF No. 24,
PageID.1764.

In this appeal, Plaintiffs argue the trainings provided were "wholly insufficient."  ECF No. 26, PageID.2641.  The trainings were, in their view, "short online videos without any meaningful application strategies demonstrated or practiced."  Plaintiffs argue that the ALJ did not consider the alleged inadequacy of FASD-related training that some ROMS staff took.

But Plaintiffs have not demonstrated that a particular amount of training is required to make a paraprofessional support individual sufficiently FASD-informed.  Moreover, it is not true that the only training available were short online videos.  Defendant, for example, summarizes additional trainings in their motion that were addressed in the hearing, organized by staff member.  ECF No. 27, PageID.2669.

The ALJ did not clearly err in finding that the training staff received on FASD was sufficient to not require a remedy, and the court finds that Plaintiffs did not carry their burden to disprove that finding.

### G.    (Assistive Technology)

In the original due process hearing, the ALJ addressed whether:

- Respondent den[ied] Student a FAPE by failing to consider and/or utilize assistive technology devices in developing and implementing Student's IEP?"

The ALJ found they did not, and that finding was not appealed by

Plaintiffs.  ECF No. 27, PageID.2654; ECF No. 26, PageID.2632.

### H.    (Procedural issues in Edison Max placement)

As explained earlier, another issue for the ALJ at the due process

hearing was the following:

> • Did Respondent give sufficient and appropriate
>   consideration to Petitioners' input, as required by the
>   Individuals with Disabilities Education Act (IDEA), 20 USC
>   1400 *et seq.*, during the April 4, 2023, IEP meeting?

As explained, the ALJ found a procedural IDEA violation because

"Respondent predetermined Student's placement decision before the

April 4, 2023, IEP team meeting and did not listen to Petitioners'

concerns with open minds during the meeting."  That finding was not

appealed by Defendant.  ECF No. 27, PageID.2654.

### I.    (Substantive issues in Edison Max placement)

Relatedly, the ALJ addressed whether:

> • Student [was] denied a FAPE by Respondent's placement of
>   Student in the Edison Max program pursuant to the April 4,
>   2023, Individualized Education Program (IEP)?

Because the ALJ ordered a new IEP meeting to discuss the proper

placement of G.A., he declined to address the substantive merit of the

placement decision (while noting that "[n]othing in this Decision and

Order precludes the IEP team from determining at Student's next IEP meeting that Edison Max is the appropriate educational placement for Student."). ECF No. 24, PageID.1766. That finding was also not appealed by Plaintiffs. ECF No. 26, PageID.2632; ECF No. 27, PageID.2654.

### J.    Private Placement

Given that Plaintiffs disagreed with the offer of placement at Edison Max, but agreed that G.A. would benefit most from placement other than at ROMS, Plaintiffs contended that a private placement was necessary to ensure the provision of a FAPE to Student, posing the following issue:

- For Student to receive a FAPE, does Student's disability require a private placement funded by Respondent?

The question presented to the ALJ was whether G.A.'s IEP should have offered private placement rather than Edison (but all apparently agreed that ROMS was an inappropriate placement for G.A.). *See* ECF No. 24-2, PageID.2500 (District's offer of FAPE at Edison); ECF No. 24-2, PageID.2488 (parents concern that placement at ROMS was not working). However, that at this point, G.A. has been unilaterally removed to a private placement. In the court's view, functionally at

44

issue at this stage is whether Defendant must reimburse Plaintiffs for this decision.  While pursuing a challenge to an IEP, the parents may unilaterally remove the student from the public school, "place the child in a private school[,] and seek reimbursement for the cost of the private school," *Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369-70 (1985), though they "do so at their own financial risk," *id.* at 373-74.  To award reimbursement, the state ALJ or district court must find both that: (1) the public school violated the IDEA and (2) the private school is appropriate under the IDEA.  *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993); *L.H. v. Hamilton Cty. Dep't of Educ.*, 900 F.3d 779, 791 (6th Cir. 2018).

In his decision, the ALJ noted that Plaintiffs had not offered up any proposed private placements to consider, and found that it was "not possible to determine whether a private placement would be appropriate for Student based on the existing record."  ECF No. 24, PageID.1766 (citing *Burlington v Dep't of Education*, 471 U.S. 359, 370 (1985)).  However, he indicated that nothing in his opinion should preclude private placements from being considered at the IEP meeting led by an independent facilitator.

This court likewise does not have a developed record before it, and it was Plaintiff's burden to develop that record. The court agrees that, at the time, the ALJ had no evidence concerning a specific private placement and did not err by concluding Plaintiffs had not carried their burden either to propose particular placements or show that such placement would have been appropriate. Although parents can seek reimbursement for private placement, parents are entitled to such reimbursement "only if a federal court concludes both that the public placement violated the IDEA, and that the private school placement was proper under the Act." *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 763 (6th Cir. 2001). Parents seeking reimbursement for a private placement bear the burden of demonstrating that it was appropriate. *E.S. v. Clarksville Montgomery Cty. Sch. Sys.*, No. 3:21-cv-00283, 2023 U.S. Dist. LEXIS 145184, at *42 (M.D. Tenn. Aug. 18, 2023) (citing *Dong v. Bd. Of Educ. Of Rochester Cnty. Sch.*, 197 F. 3d 793, 799 (6th Cir. 1999)). "Unilateral private placement does not satisfy the IDEA unless it, 'at a minimum, provide[s] some element of special education services in which the public school placement was deficient'; for example, specific special-education programs, speech or language

therapy courses, or pre-tutoring services." *L.H. v. Hamilton Cty. Dep't of Educ.*, 900 F.3d 779, 791 (6th Cir. 2018) (citing *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 523 (6th Cir. 2003)).

Both parties apparently agreed that a FAPE would not be possible for G.A. if he remained at ROMS, hence the several conversations within the IEP team, and testimony from experts at the due process hearing, about an alternative placement being the best place for G.A. But following that, the court has no evidence before it concerning the IEP meeting that occurred in October 2023, where Defendant apparently only offered placement at Edison Max again, so it is impossible to evaluate whether a procedural IDEA violation occurred at that meeting. *See* ECF No. 26, PageID.2631-32.  Further, the court does not have sufficient evidence showing how Edison Max staff were not FASD-informed or otherwise unprepared to deal with G.A.'s disabilities, and therefore cannot say on the record before it that a FAPE was substantively denied by the offer of placement at Edison. But assume, for the sake of argument, that Defendant came back to the October 2023 IEP meeting undeterred by the ALJ's decision in Plaintiffs' favor, once more failed to meaningfully consider any parental

input at all, and that this second pre-determined offer of placement at Edison Max itself constituted a denial of FAPE. *See Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 520 (6th Cir. 2003) (a procedural violation of the IDEA is not a *per se* denial of a FAPE, but will constitute a denial of a FAPE if it seriously infringes on the parents' opportunity to participate in the IEP process); *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 765 (6th Cir. 2001) ("Substantive harm occurs when the procedural violations in question seriously infringe upon the parents' opportunity to participate in the IEP process."); *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 857 (6th Cir. 2004) ("the school district was required to conduct, not just an IEP meeting, but a *meaningful* IEP meeting") (emphasis in original). Or, for that matter, assume that placement at Edison would have substantively been a denial of FAPE. Even assuming that Plaintiffs have therefore satisfied the first prong of the inquiry by showing denial of FAPE, the court has no evidence from which it could conclude that G.A.'s private placement is appropriate or "provide[s] some element of special education services in which the public school placement was deficient." *L.H.*, 900 F.3d at 791. The court has no evidence about G.A.'s private placement at all. And the

48

generalized evidence provided by Plaintiffs at the due process hearing

indicating that a proper placement would be a smaller setting with

FASD-informed staff does not give the court sufficient evidence about

the *specific* placement G.A. is attending (or would have proposed at the

time) to compare against the public offering.  The court is sympathetic

to Plaintiffs' position, but the ALJ did not err in concluding he lacked

sufficient information to find that Plaintiffs carried their burden to

show that there was a private placement that offered some service

Defendant was not offering, and at this stage the court has no more

information to conclude otherwise.

### K.    Independent Evaluation

The final question in this appeal is:

- Is Respondent obligated under the IDEA to pay for a third-
  party educational consultant to evaluate placement of
  Student?

The ALJ noted that this issue did not allege a violation of the

IDEA, but instead proposed a remedy.  The ALJ dealt with this

question by holding that, in finding that J.A. and M.A. did not have

sufficient input in the decision to place G.A. at Edison Max, a new IEP

team meeting would be held with an independent facilitator to ensure that all team members views receive appropriate consideration.   ECF No. 24, PageID.1765.  Thus, because he had ordered a new IEP team meeting with an independent facilitator, he rejected Petitioners' proposed remedy of an independent evaluator to determine the appropriate placement.  ECF No. 24, PageID.1767.

In this appeal, Plaintiffs challenge this finding by arguing, in full, "The ALJ failed to address the issue regarding the Defendants requirement to pay for a third-party educational consultant to evaluate private placements for G.A.  The ALJ left his opinion vague and ambiguous."  ECF No. 26, PageID.2646.  The court disagrees that the ALJ left his opinion ambiguous; to the court's reading, he explicitly rejected the request in favor of the remedy he had already ordered.  *See* ECF No. 24, PageID.1767.  Thus the argument that this rejection was "ambiguous" does not suffice to show by a preponderance of the evidence that the ALJ erred in fashioning the remedy he did.

## V.   CONCLUSION

Therefore, the ALJ's decision is **AFFIRMED**, the parents' appeal on the administrative record is **DISMISSED**, and the District's motion

for summary judgment on the administrative record is **GRANTED**.

Summary judgment is therefore granted to Defendant on Count I only.

This is not a final order and does not close the case.

**SO ORDERED**.


Date: September 4, 2025                          s/F. Kay Behm
                                                F. Kay Behm
                                                United States District Judge